BEFORE THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
WASHINGTON, DC

**FILED**

JUN 2 0 2008

**Clerk, U.S.** District and
**Bankruptcy Courts**

NATHAN  J. COLODNEY )
c/o Deputy Chief of Staff Office )
PSC 303, Box 45 )
APO AP 96204 )
      Plaintiff )
  )
  )
   v. )
  )
MICHAEL O. LEAVITT )
SECRETARY )
U.S. DEPARTMENT OF HEALTH AND )
  HUMAN SERVICES )
CENTERS FOR MEDICARE & )
  MEDICAID SERVICES )
  )
       Defendant )

Case: 1:08-cv-01069
Assigned To : Collyer, Rosemary M.
Assign. Date : 6/20/2008
Description: Employ. Discrim.

## COMPAINT

Nathan J. Colodney
Plaintiff, Pro Se
c/o Deputy Chief of Staff Office
PSC 303, Box 45
APO AP 96204
June 16, 2008

## Introduction

1. Plaintiff Nathan J Colodney brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000 , and the 5th Amendment Equal Protection Clause and due process requirements of the U.S. Constitution to remedy acts of discrimination in employment practices by the U.S. Department of Health and Human Services, the Centers for Medicare and Medicaid Services ("CMS") based on his sex (male), denial of equal protection and due process.

## Jurisdiction

2. This Court has jurisdiction pursuant to Title VII of the Civil Rights Act of 1964 and the U.S. Constitution, after plaintiff exhausted available administrative remedies on after he obtained a Final Agency Decision (FAD) and appealed it to the EEOC's Office of Federal Operations (OFO) after the Agency's EEOC process. pursuant to 29 C.F.R. Part 1614 -- *i.e*....  The plaintiff filed this complaint within 90 days of receipt of the EEOC's OFO's decision.

## Venue

3. Venue is proper in the District of Columbia pursuant to *42 U.S.C. § 2000e-5*(f)(3) as (a) the acts of discrimination and the violation of the 5th Amendment Equal Protection Clause and due process requirements occurred in this judicial district since Mr. Dyer maintains an office in this judicial district at which he regularly works, and Ms. Brown-Frizerra regularly works out an office in this judicial district.

## Parties

4. Plaintiff Nathan J. Colodney is a male citizen of the United States and of the State of Nevada. Mr. Colodney is currently in a supervisory GS-15 position as the Deputy Chief Information

Officer for the U.S. Forces Korea, Combined Forces Command, United Nations Command, in Seoul, Korea, a position he has held since June 2006. He is formally employed by the Department of the Army, although working in a joint and combined organization, which answers to the Secretary of Defense, the President of the United States, and the President of the Republic of Korea.

5. Defendant Michael O. Leavitt is the Secretary of Health and Human Services and as such the head of the U.S. Department of Health and Human Services (hereinafter "DHHS"), a department within the Executive Branch of the Government of the United States which has had more than 500 employees in 20 or more calendar weeks in each year since 1984. As the head of DHHS, Mr. Leavitt is responsible for the personnel actions, omissions, and practices there (including those within CMS). He is here sued only in his official capacity as head of DHHS.

## Statement of the Facts

_Nathan Colodney assumes his position as Director of Office of HIPAA Standards (OHS)_

6. In about March 2004, Mr. Nathan Colodney responded to an advertisement on www.usajobs.opm.gov for a position in the Senior Executive Service as the Director of the Office of HIPAA Standards (OHS) at the Centers for Medicare and Medicaid Services (CMS), within the U.S. Department of Health & Human Services (HHS). At the time, plaintiff was the Chief Information Officer for the Office of the Solicitor at the U.S. Department of the Interior, and held the grade of GS-15. Mr. Colodney was interviewed for the position and subsequently received an offer. He officially assumed the position or about October 17, 2004.

_The leadership of OHS prior to Colodney's arrival_

7. Prior to Mr. Colodney's assumption of the Director position at OHS, the Officer had been under the supervision of Ms. Karen Trudel in her role as the Acting Director. Ms. Trudel served

in that capacity from approximately September 2003 through October 2004. Trudel's permanent position was as the Deputy Director.

8. In September 2004, Trudel inexplicably reorganized OHS, during which she eliminated all but two Team Leader positions. The only senior male in the Office, Stanley Nachimson, a widely recognized and respected expert on HIPAA, was inexplicably taken out of a Team Leader position. Trudel's two new Team Leaders were both females, Diane Faup and Lori Davis. Ms. Lori Davis had been serving as the Acting Deputy Director, and continued to do so while working in a dual capacity.

9. There were no males in the OHS leadership until Mr. Colodney arrived after Ms. Trudel rearranged to remove Mr. Nachimson from a leadership position to ensure that only females controlled the organization.

10. The reorganization left employees feeling betrayed and kept in the dark as to why respected people were removed from leadership positions, while others who were not trusted or respected replaced them. This was the environment Mr. Colodney walked into when he assumed the position as the Director of the Office of HIPAA Standards.

11. Trudel said that she reorganized OHS to consolidate three teams working on HIPAA into one team. She said that it was all about creating efficiency in the Office. Furthermore, she stated that discussed the idea of the reorganization with her supervisor, Ms. Leslie Norwalk, the Deputy Administrator, who said it was okay.

12. Ms. Norwalk contradicted Ms. Trudel by testifying that the reorganization was her own idea because Dr. McClellan, the Administrator, wanted the Office to focus more on other matters.

13. Both Trudel and Faup had applied for and not been selected for plaintiff's position. Davis, upon plaintiff's arrival as the Director, was bump0ed from her position as the Acting Deputy

Director down to a full-time Team Leader since Trudel reverted back to her permanent position
as the Deputy Director.

*An administrative investigation is initiated*

14. On about October 31, 2004, after Mr. Colodney had been at OHS for less than 10 days, the
Agency initiated an investigation of him for sexual harassment. Ms. Brown-Frizerra testified
that she initiated it because Lori Davis filed a complaint for sexual harassment. Ms. Davis
testified that she never filed a complaint for sexual harassment. Furthermore, she stated that Mr.
Colodney never said anything sexual to her. Dyer claimed that he authorized the investigation
after an EEO accusation was brought to the attention of the LER staff.

15. Ms. Lori Davis and Ms. Karen Trudel were interviewed starting on or about October 31,
2004. Ms. Brown-Frizerra and Mr. Dyer were aware that Ms. Davis, Ms. Faup, and Ms, Trudel
were Mr. Colodney's key accusers prior to November 5, 2004, the date on which they informed
him that there would be an investigation started in the future.

16. Mr. Colodney was not told of the investigation until November 5, 2004. At that point he was
told that an investigation would be initiated, but was not told that it had in-fact started several
days earlier.

17. Ms. Charlene Brown-Frizerra, the Agency's Deputy Chief Operating Officer, was directed by
Mr. John Dyer, the Agency's Chief Operating Officer, to oversee the investigation. The
Agency's EEO policy states that investigations are to be thorough and impartial. Additionally,
Dyer told Brown-Frizerra that the investigation was to be "fair and balanced", as well as "by the
book". Dyer knew that there was an Agency policy that dictated how the investigation was to be
conducted. After stating that there would be an investigation in the future, that it would be done
by "the book", and that it would be "fair and balanced", Dyer told plaintiff to stop making

"inappropriate" comments. Brown-Frizerra also told plaintiff that he was to stop making "inappropriate" comments.

18. Although the investigation began in October 2004, it was not until Mr. Colodney's investigation interview in early December that he was told he was being investigated for sexual harassment. Nobody ever told Mr. Colodney the identify of any individual who had a concern about anything he said, what it was that he had supposedly said, or how such a comment was interpreted. All Mr. Colodney was told by Ms. Brown-Frizerra and Mr. Dyer was that someone felt "uncomfortable" with things he had said.

19. In the meeting with Ms. Brown-Frizerra and Mr. Dyer on November 5th, 2005, when they told Mr. Colodney that he was going to be investigated, Mr. Colodney expressed a serious concern because he had a problem with the conduct of his top three employees, Ms. Trudel, Ms. Faup, and Ms. Davis. Mr. Colodney explained that Ms. Trudel and Ms. Faup were unsuccessful applicants for his position, and that Ms. Davis went from being the Acting Deputy Director of OHS down to being a Team Lead upon his arrival. Mr. Dyer demeaned Mr. Colodney by scolding him for raising this matter. Mr. Dyer told him that it was inappropriate, that he had no interest it, and that Mr. Colodney had to solve the problem himself.

20. Mr. Colodney said nothing further at this meeting to Ms. Brown-Frizerra or Mr. Dyer after Mr. Dyer shut him when he asked for help.

21. The purpose of the administrative investigation was fact-finding. The Agency did not plan the investigation or establish parameters, as was required by its Standard Operating Procedure (SOP) on Administrative Investigations. Furthermore, the Agency failed to maintain verbatim transcripts of all witness interviews, as required by its SOP with which the Agency was required to comply.

22. The investigation panel started the interview by telling Mr. Colodney that his investigation interview was simply to understand what comments he made and what he meant. However, the Agency then engaged in a series of questions written by its lawyer, Ms. Beverly Dart. Ms. Dart told the investigation panel that the purpose of these questions was to ensure that regardless of how Mr. Colodney answered them it would justify his removal from the SES, which was what they sought to do.

23. Mr. Colodney was not permitted to freely answer questions during his interview. Ms. Brown-Frizerra refused to let him provide complete answers by trying to limit his responses to simple yes or no. Mr. Colodney tried to explain that the answers were not as simple as yes or no, but Ms. Brown-Frizerra persisted in her refusal. At the very end of the interview, Ms. Brown-Frizerra all of a sudden told Mr. Colodney that he was being interviewed because of a complaint for sexual harassment.

24. Much of the investigation was left in the hands on Ms. O'Dowd. Ms. O'Dowd was a low ranking employee in the Agency's Baltimore Human Resource Center. Ms. O'Dowd did not have any specialized training on EEO. Furthermore, she testified that it was not an investigation for an EEO violation, but for misconduct. At no point did Ms. O'Dowd consult with the Agency's EEO Office for guidance or assistance.

25. Ms. Brown-Frizerra, who Mr. Dyer charged with leading the investigation, did not bother to attend most of the investigation interviews because she was too busy. Ms. Brown-Frizerra was not given any written summaries of the investigation interviews, but was merely verbally briefed by Ms. O'Dowd on those points that Ms. O'Dowd considered to be important.

*The Agency's decision maker pre-decides the investigation outcome*

26. The Agency's decision maker, Mr. John Dyer, decided plaintiff would be removed almost immediately after the investigation began. He testified that the members of the investigation panel told him what was said during the investigation interviews as soon as it began. Each member of the investigation panel testified that they never said anything to Mr. Dyer about the specifics of what was said during the investigation interviews while it was ongoing. In fact, three of the four investigation panel members testified that they did not speak with Mr. Dyer about the investigation either during or after it. Ms. Brown-Frizerra was the only investigation interview panel member who spoke with Mr. Dyer while the investigation was ongoing, and she testified that she merely told him that they were taking interviews, but not the specifics of what was said by the witnesses.

27. Mr. Dyer testified that he determined at the very beginning of the investigation that Mr. Colodney had "done an EEO violation" and that there was "overwhelming evidence". At that time he decided there was no hope for Mr. Colodney.

*Prima facie discrimination by the Agency decision maker*

28. Mr. Dyer contends that he was Mr. Colodney's supervisor, and that he allegedly became Mr. Colodney's supervisor in November, a few weeks after Mr. Colodney's arrival at CMS.

29. Mr. Dyer was also Ms. Karen Osteen's supervisor. Ms. Osteen, like Mr. Colodney, was a probationary member of the SES. Ms. Osteen testified that she did not have a performance plan, with performance requirements, during the time Mr. Colodney was an SES. However, on information and belief, Ms. Osteen was placed under a performance plan during this period while Mr. Dyer did not provide one to Mr. Colodney.

30. Both Mr. Colodney and Ms. Osteen were probationary members of the SES, pay plan, ES, grade 00, and Series 0340. Ms. Osteen is a female while Mr. Colodney is a male.

31. Mr Dyer met regularly with Ms. Osteen to discuss her job responsibilities. He also met with her weekly to discuss issues concerning her area of responsibility in the Agency. Nobody ever discussed Mr. Colodney's job responsibilities with him. Furthermore, Mr. Dyer never provided any assistance to Mr. Colodney to resolve any alleged problems in his officer. In fact, when Mr. Colodney raised serious issues concerning Ms. Trudel, Ms. Davis, and Ms. Faup, Mr. Dyer shut him up and told him it was inappropriate to ask for help. Thereafter, Mr. Dyer never again met with the Mr. Colodney because Mr. Dyer considered Mr. Colodney hopeless after declaring that he had "done an EEO violation" and there was "overwhelming" evidence of it.

*Colodney's alleged failure to lead*

32. Ms. Brown-Frizerra verbally briefed Mr. Dyer on the "allegations" after she closed her investigation. She testified that she told Mr. Dyer the "allegations" that were made against Mr. Colodney based on the "Summary of Allegations". Ms. Frizerra-Brown testified that the investigation panel did not prepare a Report of Investigation, as required by the Agency's SOP on Administrative Investigation, nor were there findings of fact that were to be contained in the Report of Investigation. The SOP required that a decision on what was to be done after the investigation was to be made on the Report of Investigation, but none existed, just as no findings of fact existed.

33. The "Summary of Allegations", a document prepared by Ms. O'Dowd, was the sole outcome of the investigation.

34. Ms. Brown-Frizerra testified that she never determined Mr. Colodney made any unprofessional or inappropriate comments. Furthermore, she testified that it was not the purpose of the investigation to make such an assessment. She said that the only purpose of the investigation was to determine if Mr. Colodney led his office to correct the problems.

35. Ms. Brown-Frizerra stated that she recommended plaintiff be removed from the SES because he failed to lead the Office of HIPAA Standards after he was informed of the investigation. According to Ms. Brown-Frizerra, she recommended that Mr. Colodney be removed for his failure to lead. She said that that Mr. Colodney did not fix the problems in his office once he was informed of them. However, all Mr. Colodney was told was that someone in his office felt "uncomfortable" with comments he allegedly made, and Ms. Brown-Frizerra vilified Mr. Colodney for figuring out who was supposedly "uncomfortable".

36. Ms. Brown-Frizerra also stated that the problem in Mr. Colodney's office was that his employees, namely Ms. Faup, Ms. Trudel, and Ms. Davis, felt that there was a hostile work environment. However, Ms. Brown-Frizerra and Ms. Taylor stated that Mr. Colodney did not create a hostile work environment. Thus, Mr. Colodney, according to Ms. Brown-Frizerra, Mr. Colodney did not lead by failing to correct the problem that she testified did not exist.

37. Mr. Dyer removed plaintiff from the SES. According to Mr. Dyer, he based his removal decision on Ms. Brown-Frizerra's recommendation. Furthermore, he stated that Ms. Brown-Frizerra's recommendation was supported by her investigation. He then admitted that he never read a single document from the investigation and that at his level everything is done verbally, so he doesn't read anything. Mr. Dyer also admitted that he did not bother to look at the investigation file to see if there were documents that supported Ms. Brown-Frizerra's recommendation. Mr. Dyer stated that he did not need to do so because these sorts of things were always documented when he had seen them done in the past. Meanwhile, he testified that he had only seen one other SES removed at CMS prior to Mr. Colodney, and that removal did not involve an investigation.

*Allegations of EEO violations by OHS females are concealed by an Agency's investigator*

10

38. During the investigation process Ms. O'Dowd ignored information from Mr. Stanley Nachimson, a male GS-15, that the same females involved in pushing the investigation of Mr. Colodney were engaged in the same conduct that the Agency alleged compelled it to investigate Mr. Colodney.

39. Ms. O'Dowd did not report this allegation to anyone else, nor did she initiate an investigation of the females pursuant to the Agency's policy on offensive comments and EEO. She said that Mr. Nachimson would have had to have filed a formal complaint for sexual harassment for her to have to conduct an investigation of the matter.

*Trudel's Sexual Harassment and Offensive Remarks About Colodney*

40. Shortly after Mr. Colodney was removed from the SES and reversion to being a GS-15, Mr. Stanley Nachimson heard that Ms. Karen Trudel, a GS-15 in a management position in the Agency, made a comment about Mr. Colodney being a sexual harasser.

41. Ms. Trudel told Ms. Mary Homans and Ms. Laura Grange that Grange should be glad she was out of the Office while Mr. Colodney was the Director of OHS because Mr. Colodney would have sexually hit on her. Mr. Colodney subsequently filed a civil action in federal court against Ms. Trudel for defamation, which Mr. Dyer sought to have dismissed. Mr. Dyer stated he spoke with Ms. Trudel on the day she was served with the law suit. He further stated that Ms. Trudel told him what the law suit said she had done, thus he knew the allegations.

42. Mr. Dyer admitted to being aware of Mr. Colodney's contention that Ms. Trudel made offensive comments about his sexuality, interpersonal relationships, and attitudes towards females. Mr. Dyer initiated the administrative investigation of plaintiff because he allegedly violated the Agency's policy on EEO and offensive remarks of a sexual nature. Mr.Dyer said the

Agency was required to conduct an investigation of someone as soon as information came to management's attention, but refused to enforce the policy against Ms. Trudel, a female.

43. Mr. Dyer stated that he was not concerned with what Ms. Trudel said about Mr. Colodney. He said the Agency's EEO policy did not count in the situation involving Ms. Trudel. Additionally, he stated that Mr. Colodney already had an EEO action going because of his removal from the SES, so he did not need to act on Ms. Trudel's behavior, although he could not explain how the pending EEO action related to Ms. Trudel's post-removal comments about Mr. Colodney since it was not raised in Mr. Colodney's EEO complaint.

44. Mr. Dyer had no problem with initiating an investigation of Mr. Colodney for sexual harassment when Ms. Davis simply expressed concern over comments Mr. Colodney made that she did not believe or allege to be sexual in nature. When it came to initiating an investigation against Mr. Colodney, a male, any allegation, even when the individual reporting the comment did not consider the comments to be of a sexual nature, required an investigation. Comments by Ms. Trudel, a female, were excluded from enforcement of the policy.

*The inapplicability of the Agency's EEO policies to females*

45. In or about May 2005, Mr. Colodney filed an EEO complaint for Mr. Dyer's disparate treatment of Mr. Colodney resulting from his failure and refusal to investigate Ms. Trudel pursuant to the Agency EEO policy on offensive comments of a sexual nature. After an informal EEO investigation, Mr. Colodney filed a formal complaint, which the Agency rejected. The Agency concluded that Mr. Dyer's behavior was a continuation of his prior activity and fell under the purview of the EEO matter at-bar, which was initiated back in December 2004, a month prior to Ms. Trudel's action.

46. Ms. O'Dowd had also refused to act and investigate females in the Office of HIPAA Standards when Mr. Nachimson told her that the same females pushing the investigation of Mr. Colodney were saying the same sorts of things of which they accused him.

*The alleged basis for initiating the administrative investigation*

47. Ms. Lori Davis was in the bargaining unit. As such Ms. Davis was covered by the Collective Bargaining Agreement (hereinafter known as the Master Labor Agreement or "MLA"). The MLA became effective on June 9, 2004. Ms. Davis contacted Ms. Barbara Ann Wilhelm, an attorney on the Agency's Labor Employee Relations Team (LERT). Ms. Davis told Ms. Wilhelm everything Mr. Colodney allegedly said, but Ms. Davis did not allege sexual harassment and did not consider anything plaintiff did to be sexual in nature.

48. When Ms. Davis spoke to Ms. Wilhelm, she told her that Mr. Colodney was her new boss and that she did not know how to take some comments he made. She then told Ms. Wilhelm the comments, at which point Ms. Wilhlem gave her a look, which was a facial expression of disapproval and disgust. Ms. Davis testified that it was only after Ms. Wilhelm's reaction that she said that she was offended by what Mr. Colodney allegedly said.

49. Ms. Wilhelm, an attorney, also did not assess Mr. Colodney's comments to be of a sexual nature. She said that she personally considered Mr. Colodney's comments to have violated an Agency policy on offensive non-sexual remarks she alleged was in effect at the time, but could not identify the policy. Ms. Wilhelm said that Ms. Davis told her that she was offended because the comments made were about women. Ms. Davis, however, never claimed that Mr. Colodney's comments were offensive because they were against women.

50. Ms. Wilhelm referred the matter to her supervisor, Ms. Kathy Hoffman. Ms. Hoffman subsequently referred it to Ms. Donna O'Dowd for investigation. Ms. O'Dowd said that Ms.

Hoffman told her "that an employee in Mr. Colodney's unit had **complained** [emphasis added] about inappropriate comments." Ms. Brown-Frizerra testified that Ms. Davis had filed a "complaint" against Mr. Colodney for sexual harassment.

*The Agency violates federal law to initiate an investigation*

51. Ms. Brown-Frixzerra, throughout most of the investigation, was the Agency's Collective Bargaining Official, responsible for acting as the Agency's primary official for overseeing/managing the MLA.

52. Chapter 24 of the MLA, entitled Grievance Procedure, Section 1, Purpose, states that "[t]he purpose of this Article is to provide a mutually acceptable method for the prompt settlement of grievances filed by employees or the Parties. Section 2, Scope, states that: [a] grievance as defined by 5 U.S.C. §7103(a)(9) means any complaint: "A. **by an employee concerning any matter relating to the employment of the employee** [emphasis added]; B. by the Union concerning any matter relating to the employment of the employee; C. by an employee, the Union **or the Agency** [emphasis added] concerning: 1. the effect or interpretation or a claim of breach of the collective bargaining agreement or 2. **any claimed violation, misinterpretation or misapplication of any law, rule or regulation affecting conditions of employment**. [emphasis added]"

53. The MLA, Section 3, General Provisions, Paragraph A states that "[t]his negotiated procedure will be the **exclusive procedure** [emphasis added] available to the Union, the Agency and employees for resolving grievances." In regard to EEO, Paragraph D states:

> An employee affected by a prohibited personnel practice or discrimination may raise the matter under a statutory procedure or the negotiated grievance procedure, but not both. An employee will be deemed to have exercised his/her option at such time as he/she timely files a grievance in writing or initiates an action under the applicable procedure.

54. Ms. Brown said that Ms. Davis' filed "a complaint" for sexual harassment by the Mr. Colodney. Ms. Hoffman also said that an employee "complained" about Mr. Colodney. The Agency contended that it had to investigate Mr. Colodney because of Ms. Davis' complaint. The policies the Agency alleged that required the investigation are the Agency's Equal Employment Opportunity Statement, dated September 21, 2004, its Policy Statement on Sexual Harassment, Offensive, and Inappropriate Conduct, dated September 21, 2004, and the U.S. Department of Health & Human Services Internal Operating Procedures for Reporting Improper Conduct and Criminal Offenses, dated June 2, 1999.

55. Article 1 of the MLA states:

> The Parties will be governed by this Agreement, existing and future laws, existing Government-wide rules and regulations and subsequently-enacted Government-wide rules and regulations implementing 5 U.S.C. §2303 in accordance with 5 U.S.C. Chapter 71.

56. The Agency's Equal Employment Opportunity Policy Statement says that:

> [i]f the employee's supervisor is the source of the harassment, the employee should speak to the next highest level of management. Employees are free to report incidents of harassment without fear of reprisal. Also, the Agency will protect the confidentiality of harassment allegations to the extent possible.

57. The Policy Statement on Sexual Harassment, Offensive and Inappropriate Conduct states that:

> [i]f the employee's supervisor is the source of the harassing, offensive, or inappropriate action, the employee should speak to the next highest level of management. Employees are free to report incidents of sexual harassment, offensive, or inappropriate conduct without fear of reprisal. Also, the Agency will protect the confidentiality of harassment allegations to the extent possible.

58. The Agency, in its response to Mr. Colodney's interrogatories before the EEOC, stated that the U.S. Department of Health & Human Services Internal Operating

Procedures for Reporting Improper Conduct and Criminal Offenses, dated June 2, 1999 provided a basis for investigating him.

59. The U.S. Department of Health & Human Services Internal Operating Procedures for Reporting Improper Conduct and Criminal Offenses, dated June 2, 1999 specifically states under section 5-10-10, DEFINITIONS, that:

> D. This chapter **does not cover** procedures for handling of matters related to loyalty and security, **employee grievances, equal employment opportunity complaints, including sexual harassment complaints [emphasis added]**, classification appeals, or other matters for which a formal Governmentwide review system has been established by the Federal Government.

60. According to the MLA, neither the employee, nor the Agency had the authority to vary from the exclusive procedures established therein. The MLA grievance procedure is a 2-step process. The first requires that the employee provide the manager all grievances in writing and on the CMS Standard Grievance Form. The grievance information that must be presented is to include the date filed, the name of the grievant, sufficient detail to identify the basis of the grievance, including the specific Article and section of the MLA, and general reference to any practice, law, rule, or regulation alleged to have been violated, misinterpreted or misapplied, and any alleged facts and the specific relief the employee seeks.

61. The Agency did not comply with any of the terms of the MLA despite the fact that the Agency's Collective Bargaining Official, the person most knowledgeable of the agreement, led the investigation of Mr. Colodney, and the panel consisted of her successor, as well as employee's of the Agency's Labor Employee Relations Team who claimed to be very or intimately familiar with the MLA.

*The Agency's failure to comply with the SOP on administrative investigations*

62. The Agency had an SOP on the conduct of administrative investigations. Pursuant the Agency's SOP on Administrative Investigations, paragraph 9, Mr. Dyer was to have made his decision based on the Report of Investigation, which was a required output of the investigation.

63. Mr. Ernie Tucker, the Deputy Director of the Baltimore Human Resources Center (BHRC), which is the human resources office under which the CMS Labor Employee Relation Team works, stated that it is mandatory to comply with the SOP on administrative investigations. After the investigation, Mr. Tucker reviewed the file, but did not pay attention to the lack of compliance with the SOP. Mr. Dyer knew there were rules and procedures by which the investigation had to be conducted. Mr. Dyer ignored compliance with the SOP and never reviewed the investigation file. He was completely disinterested in the propriety of what was being done.

64. Ms. Brown-Frizerra, who was told to conduct the investigation by the book, never bothered to ask the BHRC of the procedures because she had absolutely no interest in them. Ms. O'Dowd admitted knowing that there was an SOP on the conduct of administrative investigations and had read it. Ms. O'Dowd said she did not bother to follow it in Mr. Colodney's case because she did not feel she needed to do so. The provisions Ms. O'Dowd did not adhere to in the SOP included, but were not limited to carefully planning the investigation, setting parameters, taking word-for-word deposition transcripts and not producing edited summaries, making findings of fact with evidence to support each and every fact, producing a written Report of Investigation, and the supervisor making a decision to take action or close the matter based on the Report of Investigation.

65. The SOP, paragraphs 4(a)-(f) requires that the investigation be planned, including clearly stating the objective and scope. Ms. O'Dowd stated that she performed no planning, no clearly

stated objective was determined and no scope established. Furthermore, she said that she did not ask for an objective or parameters for the investigation before delving into it.

66. The SOP, paragraphs 7(f) and (h) emphasizes that the Agency must take down each witness' statement word-for-word. The SOP states that witness statements were not to be summarized or edited. Ms. O'Dowd was the only investigation panel member who attended every investigation interview and wrote all of the investigation summaries. She admitted that she knew court reporters had been used in the past to take down investigation interviews word-for word. A court reporter was used during the administrative investigation of Douglas Godesky, the only other person in OHS on whom an administrative investigation had been conducted in the two years prior to the investigation of Mr. Colodney. Ms. O'Dowd did not use a court reporter in this case because she did not feel like it. Furthermore, she said that she could not write fast enough to take down what witnesses said word-for-word. Ms. O'Dowd, without a reason besides the fact that she felt like it, decided she would summarize each witness interview in her own words.

67. Lieutenant Commander (Lt Cdr) (US Public Health Service) Alicia Bradford said that her summary was not accurate and was warped against Mr. Colodney. Lt Cdr Bradford said that she tried to tell Ms. O'Dowd what the environment was like under Ms. Trudel, prior to Mr. Colodney arrival. Ms. O'Dowd testified that she let people say whatever they so desired, but she LCDR Bradford testified that Ms. O'Dowd refused to let her talk about Trudel, telling her that the investigation was about Mr. Colodney, not Ms. Trudel.

68. Ms. Mary Jo Cook, Mr. Colodney's former secretary, said that her summary was factually inaccurate and that she tried to rewrite it to get it "closer" to what she actually said in her investigation interview.

69. Ms. O'Dowd wrote Mr. Brad Peska's summary to say that Mr. Colodney told his staff in a briefing that if they wanted to leave OHS, he would get rid of them. Mr. Peska testified that he never said this to Ms. O'Dowd. Mr. Peska stated that Mr. Colodney told his staff that he had an obligation to help them achieve their career goals, so that if they wanted to move into other positions for the purpose of career development or promotions, they should tell him and he would work with them to try to help them, if possible.

70. Ms. O'Dowd did not prepare the investigation interview summaries until all the interviews were done. The interviews started on November 2, 2004 and did not end until Mr. Colodney's on December 2, 2004. Ms. O'Dowd's version of Mr. Colodney's investigation interview summary was only 8 single spaced pages. Mr. Colodney was rushed to review it and sign it when he did not receive it until several days after the actual interview. His corrected and signed investigation interview summary was 11 single spaced pages. The Agency refused to accept Mr. Colodney's corrected interview summary as the only version for the official record, as was done with those produced by its other witnesses. The Agency intentionally withheld a third version of the Mr. Colodney's summary, which reflected Ms. Jackie Taylor's directive of the afternoon of December 15, 2004, that directed his summary be signed and submitted by the end of the day.

71. Mr. Colodney mounted protestations that there were many problems with Ms. O'Dowd's draft that needed to be addressed before submitting a signed version. He dated the final document as 12/15/04, but it wasn't actually given to the Agency until 12/20/05. Ms. Taylor contended that Ms. O'Dowd took extensive notes and that O'Dowd's version corresponded to Ms. Taylor's memory. Ms. O'Dowd admitted that she cannot take notes word-for-word because she can't write as fast as people talk.

72. Paragraph 8 of the SOP, "Preparing the Report of Investigation," requires that an

extensive report be <u>written</u>. The SOP requires a "Statement of Facts", with each fact supported by one or more exhibits. The SOP requires the investigator's conclusions. Ms. O'Dowd failed to prepare any ROI.

73. As the leader of the investigation and the only person who attended all of the investigation interviews, but neither during nor after the investigation did she brief Mr. Dyer. Furthermore, neither Ms. Taylor, nor Ms. Osteen ever briefed Mr. Dyer.

74. Ms. Brown-Frizerra was the only person who briefed Mr. Dyer on the investigation.

75. There were no findings of fact presented to Mr. Dyer because Ms. Brown-Frizerra merely presented "allegations" against Mr. Colodney. No witness was ever asked how he/she interpreted any comment allegedly made by Mr. Colodney. No witness alleged the existence of a hostile work environment or that they believed they were being sexually harassed.

76. The SOP states that the last step in the process is the "[m]anger makes decision." The SOP provides that the manager, in consultation with Labor Employee Relations Staff (LERS) will review the complete report of investigation and make a decision to close the matter or take further action. Mr. Tucker, the Deputy Director of the Baltimore Human Resources Office, of which the LERS is a part, stated that he was involved in advising on the removal action. Rather than adhere to the SOP by requiring a ROI and making his decision to remove Mr. Colodney based on the ROI, Mr. Dyer made his decision almost immediately after the investigation began.

*Dyer's post-investigation decision making process*

77. Mr. Dyer never looked at or asked to see a single document before making his decision to remove Mr. Colodney. He said that at his level he does not read anything, everything is done verbally.

78. Ms. Brown-Frizerra stated that the investigation panel found that Mr. Colodney did not violate EEO. She recommended that plaintiff be removed from the SES because his employees felt as though he created a hostile work environment. Additionally, she said that Mr. Colodney failed to lead by taking any actions to fix the problem in OHS after being informed of it.

79. Ms. Brown-Frizerra and Mr. Dyer merely told Mr. Colodney that several of his employees felt "uncomfortable" with what he said. The only hint of anything said to Mr. Colodney by Ms. Brown-Frizerra and Mr. Dyer was that employees felt "uncomfortable" with something he had said. Mr. Colodney figured out who the employee was from the parking lot a few days after being informed of the investigation, but he was vilified for figuring that out.

80. Almost immediately after Mr. Colodney figured out the identity of the employee (Ms. Lori Davis), and the employee knew that he was aware of what she had done, they spoke. When Mr. Colodney was informed of the investigation, Mr. Dyer specifically told him not to do anything for the next 90 days and to just observe.

81. Mr. Colodney, after being informed of the investigation, immediately set forth to bring all the employees in the Office together to start building a team by engaging an internal Agency consultant, Ms. Robin Williams, to assist with team building. Within days of being informed of the investigation, Mr. Colodney held an Office-wide meeting to discuss his management philosophies with the employees. He then held one-on-one meetings with each employee to discuss where the Office stood, the problems each employee felt existed, and his vision for the future.

82. Ms. Williams determined that there were very serious and deep-rooted problems in OHS that predated Mr. Colodney's arrival and were attributable to Ms. Trudel's leadership of the Office as the Acting Director for a year prior to Mr. Colodney's arrival. The only thing Ms. Williams

attributed to Mr. Colodney was that employees noticed that he and Ms. Trudel were not working together. Detailed notes from Ms. Williams work revealed that employees had significant problems with Ms. Trudel's management (or lack thereof) and a lack of leadership/guidance from her Team Leaders, Ms. Davis and Ms. Faup.

83. Employee complained to Ms. Williams about Ms. Trudel's lack of communication, lack of dissemination of work, and desire to ensure the limelight remained on her. One employee noted how Ms. Trudel was doing nothing to help Mr. Colodney and how Ms. Davis resented being made a Team Leader after serving as the Acting Deputy prior to Mr. Colodney's arrival. Numerous employees said that what Mr. Colodney was doing with team building and trying to change the Office to make it a better place in which to work was the right thing to do and exactly what the organization needed.

84. Ms. Williams briefed Mr. Colodney and Ms. Trudel on the findings of her study of OHS. Ms. Trudel admitted that none of the problems identified were a surprise to her. After Mr. Colodney was removed, Ms. Trudel was made the Acting Office Director, held one meeting with the Office pertaining to team building, which was arranged while Mr. Colodney was still the Office Director. Thereafter, she did nothing because she said that she did not have the time.

85. Ms. Brown-Frizerra testified that she conferred with Ms. Williams about her work with Mr. Colodney, but she did not discuss the details of Ms. Williams' study to find out exactly what Mr. Colodney's employees said about Ms. Trudel, Ms. Faup, Ms. Davis, or Mr. Colodney. Ms. Brown-Frizerra blamed Mr. Colodney for all the problems in the Office, said he failed lead, and that he needed to be removed from the SES. Furthermore, Ms. Brown-Frizerra said that Ms. Williams claimed there was nothing she could do to help Mr. Colodney improve the situation in his Office because the environment was so bad.

86. Ms. Williams' testimony was contrary to Ms. Brown-Frizerra's in that she specifically said that the problems pre-dated Mr. Colodney's arrival and she could not even determine if he exacerbated them at all.

*The Agency's manipulation of witness testimony*

87. Ms. Cook, Mr. Colodney's secretary, told Ms. O'Dowd that Mr. Colodney did not tell her not to get Ms. Faup a parking spot at the main HHS building. Ms. Cook said that Mr. Colodney was trying to be nice to Ms. Faup and did not do anything different than anyone else in the Office would have done. Ms. O'Dowd ignored this testimony, instead opting to cite only Faup's allegation and never raise the issue of Faup's credibility since Ms. Cook totally contradicted Ms. Faup. Ms. Faup claimed that Ms. Cook told her Mr. Colodney said that she was not to get Ms. Faup a parking pass. Ms. O'Dowd tried to imply that Mr. Colodney was some sort of sexual predator by claiming that he wrongfully told Ms. Cook not to get Ms. Faup a parking spot at the Main HHS Building.

88. Lieutenant Commander (LCDR) Alicia Bradford, US Public Health Service, testified that she believed her interview summary was warped against Mr. Colodney. Ms. Cook said the same thing. LCDR Bradford tried to tell the investigator what the environment was like in OHS prior to Mr. Colodney's arrival, but Ms. O'Dowd refused to let her speak.

89. Mr. Peska signed an investigation interview summary saying that Mr. Colodney told people that if they didn't like the office, then they should leave. In his deposition, he admitted that the statement was false. He stated that the truth was that Mr. Colodney told people that it was his obligation to help them develop professionally, so that if there was a job in another office they wanted for career development or things they wanted to try to gain the experience, that they should let him know so that he could help them. Mr. Colodney told OHS that he would talk to

other managers to try to help people move around the Agency or into other agencies, if that's what people wanted to do for their careers since the government is a big place that affords lots of opportunities.

*An Agency investigator conceals alleged EEO misconduct by females once reported*

90. In November 2004, after Ms. O'Dowd interviewed Mr. Nachimson, he contacted her regarding EEO policy violations by females in the Office of HIPAA Standards. Mr. Nachimson told Ms. O'Dowd that the same females who complained about Mr. Colodney were themselves involved in conversations of a sexual nature in the main bay area of the Office, outside of his door. Ms. O'Dowd was the person in the LERT office responsible for dealing with employees in the Office of HIPAA Standards. She listened to Mr. Nachimson, but he never heard back from her.

91. O'Dowd alleged that she remembered nothing about receiving any complaints about females in the Office, something she said she surely would have investigated. O'Dowd said that it was the Agency's policy to initiate an investigation whenever she was made aware of any potential violation of the EEO policy.

*Colodney's investigation interview*

92. Ms. Brown-Frizerra started Mr. Colodney's investigation interview by telling him that the panel just wanted to hear what he said and what he meant by his comments. Ms. Brown-Frizerra specifically told plaintiff that the panel was not there to judge him. The investigation panel asked him questions designed to bring about a response that the Agency could use against him, regardless of how he answered them.

93. Ms. Beverly Dart, the attorney advising the interview panel, intentionally designed interview questions to elicit answers that could be used to remove Mr. Colodney, regardless of how the

questions were answered. Ms. Dart specifically called the panel's attention to the fact that her

questions were designed to elicit answers they could use, regardless of how Mr. Colodney

answered the questions, to justify his removal.

*The decision making process*

94. Ms. Brown-Frizerra relied on what Ms. O'Dowd verbally summarized to her since she was

too busy to attend the investigation interviews. Ms. Dyer said that he based his conclusions on

Ms. Brown-Frizerra's recommendation, which were supported by the results of her investigation.

Additionally, Mr. Dyer admitted that he made up his mind about Mr. Colodney almost

immediately after the investigation began. Mr. Dyer said that he based his conclusions on Ms.

Brown-Frizerra's recommendation, which were supported by the results of her investigation.

95. Ms. Brown-Frizerra briefed Mr. Dyer after the investigation. However, she actually attended

less than half of the interview because she was too busy to be bothered by them.

*The removal action*

96. Mr. Dyer issued a Notice of Removal on December 23, 2004. Mr. Colodney's removal was

based on 5 CFR 359.402, "Removal: Unacceptable Performance". SES "performance means the

accomplishment of the work described in the senior executive's performance plan." 5 CFR

430.303. "Senior executive performance plan means the written summary of work the senior

executive is expected to accomplish during the appraisal period and the requirements against

which performance will be evaluated. The plan addresses all critical elements and any other

performance elements established for the senior executive." 5 CFR 430.303. "Each senior

executive must have a performance plan that describes the individual and organizational

expectations for the appraisal period and sets the requirements against which performance will

be evaluated." "Performance requirements" means "[a]t a minimum, plans must describe the

level of performance expected for fully successful performance of the executive's work. These are the standards against which the senior executive's performance will be appraised." 5 CFR 430.305

97. Ms. Taylor, a senior HR manager, admitted that Mr. Colodney was not given an SES performance plan. The Agency's final draft of its own SES Performance Management Plan states that "[w]ritten performance plans are provided to the executive usually within 30 days of the beginning of the appraisal period."

98. Nobody spoke with Mr. Colodney about his job or anything having to do with performance throughout his time as an SES. The job announcement for the position Mr. Colodney held states that the applicant "must clearly show that you possess the experience, knowledge, skills, and ability to perform the duties of an executive." The Agency stated in the Notice of Removal that Mr. Colodney failed to meet two of five of the ECQs. The Office of Personnel Management convenes Qualification Review Boards (QRB) to certify the executive/managerial qualifications of a candidate before initial appointment to an SES position. 5 CFR 317.502

99. The Agency's counsel, Ms. Dart, expressed doubt that Mr. Colodney could be removed because he did not have a performance plan. SESers are required to serve a 1- year probationary period so that the Agency can assess the new SES' "performance". 5 CFR 317.503(a). The law, at 5 CFR 430.305, requires that "[a]t a minimum, plans must describe the level of performance expected for fully successful performance of the executive's work. The Notice of Removal stated that Mr. Colodney's executive "performance" was "less than fully successful."

100. Nobody spoke with Mr. Colodney about his job. In fact, Mr. Colodney did not even know the identity of his supervisor. Mr. Dyer and Ms. Norwalk allegedly switched supervisory responsibility for Mr. Colodney, without anyone knowing it. Mr. Dyer's own Deputy, Ms.

Brown-Frizerra, said that M. Norwalk was plaintiff's supervisor. Nobody knew that this switch occurred and Mr. Dyer never bothered to submit any paperwork. Mr. Dyer alleged that he told plaintiff this during one of "our meetings". However, Mr. Dyer admitted that he and Mr. Colodney had only two meetings. The first meeting between Mr. Dyer and Mr. Colodney was during the first week to say hello and the second was when he informed Mr. Colodney that was under investigation.

101. Mr. Dyer admitted that the change of supervisors was made in the November timeframe. The investigation started on or about October 31st. A letter was sent by the Agency's HR office to Ms. Norwalk, who was, at least initially, plaintiff's supervisor. The HR letter said that "[t]the probationary period is intended to bridge the gap between potential and actual performance." It then tells Ms. Norwalk that she is to observe Mr. Colodney's "performance." Finally, it tells her to initiate an action to remove the employee if it becomes apparent, "after full and fair consideration" that the employees "performance" is not satisfactory.

102. Mr. Colodney was given 10 days on the job before the Agency began its investigation. After beginning the investigation, Mr. Dyer immediately determined there was no use in meeting with Mr. Colodney. When Mr. Dyer told Mr. Colodney that he was going to be investigated, he told him not to do anything and to just observe for the next 90 days.

103. Mr. Colodney was removed on or about December 23, 2004, which was only days after he engaged in protected activity by filing an EEO complaint. Mr. Dyer admitted that he knew Mr. Colodney filed an EEO complaint before the removal.

*Removing white male probationary members of the SES was policy at CMS*

104. Mr. Dyer began employment at the Agency and assumed his position as the Chief of Staff in July 2004. Ms. Brown-Frizerra assumed her position as the Deputy Chief of Staff in May

27

2004. On or about October 15, 2004, the Agency removed a probationary, white, male SESer.

Approximately 3 weeks after Mr. Colodney's removal, the Agency initiated the removal of a

third probationary, white, male SES, but he resigned in lieu of removal. Throughout the entire

government, there were no probationary members of the SES removed between FY99 and FY01.

Between FY94 and FY98, only one probationary SES was removed per year for the entire US

Government.

*Dyer acts ultra vires and the Agency ignores it*

105. Mr. Dyer admits that he made the decision to remove Mr. Colodney. He also admits that

he was the one who actually removed Mr. Colodney. Furthermore, he signed the Letter of

Removal. Ms. Norwalk did not possess the power to delegate removal authority to Mr. Dyer and

Mr. Dyer admitted that he did not have SES removal authority.

*The Agency's standard for offensive comments/materials in the workplace, per it's policy
statements.*

106. The Agency gives away the City Paper at an entrance to the building through which a great

many people walk each day. The front page of the City Paper during the week plaintiff was

removed has a picture of a cross-dresser on the front, with the heading "Jingleballs". The ads in

this paper are for adult sex telephone lines, prostitutes, and a myriad of other adult services. The

Agency's own attorneys referred to the City Paper as an "adult newspaper/magazine."

*The Agency's alleged non-discriminatory reasons for its actions.*

107. The Agency stated that its investigation was properly initiated after a complaint was

filed against Mr. Colodney and that it properly conducted the investigation because it did

not need to comply with the SOP.

108. The Agency stated that Mr. Colodney was removed from the SES because he failed

to lead, and because he made inappropriate and unprofessional comments.

28

109. The Agency stated that Mr. Colodney's removal was not retaliation because he was removed for failing to lead and making unprofessional and inappropriate comments.

### Count I – Title VII of the Civil Rights Act of 1964

110. Paragraphs 1 through 109 are herein incorporated by reference.

111. The Agency discriminated against Mr. Colodney on the basis of his gender [male] when it initiated and conducted an administrative investigation of him. The Agency's wrongful actions include, but are not limited to its failure to comply with its MLA, its failure to have a valid basis for an investigation, its failure to comply with the SOP on administrative investigations, and its failure to comply with its policy statements that required the investigation be thorough and impartial.

112. As a result of defendant' violations of Title VII, plaintiff has suffered and continues to suffer damage in the form of lost promotions and lost promotional opportunities, lost pay and other benefits associated with such promotions and otherwise, damage to his professional reputation and his career, as well as other expenses. In addition, Mr. Colodney has suffered and continues to suffer emotional and mental distress and personal and professional humiliation, which has diminished his enjoyment of life and caused him additional pain and suffering.

### Count II – Title VII of the Civil Rights Act of 1964

113. Paragraphs 1 through 109 are herein incorporated by reference.

114. The Agency discriminated against Mr. Colodney on the basis of his gender [male] when it removed him from the SES. As a result of defendant' violations of Title VII, Mr. Colodney has suffered and continues to suffer damage in the form of lost promotions and lost promotional opportunities, lost pay and other benefits associated with such

promotions and otherwise, damage to his professional reputation and his career, as well as other expenses. In addition, plaintiff has suffered and continues to suffer emotional and mental distress and personal and professional humiliation, which has diminished his enjoyment of life and caused him additional pain and suffering.

### Count III – Retaliation for Engaging in EEO Activity

115. Paragraphs 1 through 109 are herein incorporated by reference.

116. Mr. Colodney engaged in protected activity by seeking EEO counseling and pursuing an EEO matter on or about December 12, 2004. Mr. Dyer issued his Notice of Decision to Remove Mr. Colodney from the SES on or about December 22, 2004. Mr. Colodney was removed from this SES despite the fact that there were no findings of fact from the Agency's investigation; Mr. Dyer never read a single document from the investigation; Mr. Dyer did not know whether there was sufficient documentation in the file to support a removal action for any reason, yet said it was there because he had always seen these things in the file when he had seen these things done in the past; Mr. Dyer based his decision to remove on Ms. Brown-Frizerra's recommendation to remove, which was because Mr. Colodney allegedly failed to lead to correct a problem when both she and Mr. Dyer were aware that nobody ever provided Mr. Colodney any details concerning the alleged problem to permit Mr. Colodney to fix it and when Ms. Brown-Frizerra admitted that the alleged problem did not exist; Mr. Dyer did not even know the reason Ms. Brown-Frizerra recommended removal, and; Mr. Dyer did not even know the allegations against Mr. Colodney.   Moreover, Mr. Dyer failed to act thoroughly and impartially, as required by the Agency's policy statements.

117. As a result of defendant' violations of law, Mr. Colodney has suffered and continues to suffer damage in the form of lost promotions and lost promotional opportunities, lost pay and other benefits associated with such promotions and otherwise, damage to his professional reputation and his career, as well as other expenses. In addition, Mr. Colodney has suffered and continues to suffer emotional and mental distress and personal and professional humiliation, which has diminished his enjoyment of life and caused him additional pain and suffering.

### Count IV – Denial of Freedom of Speech

118. Paragraphs 1 through 109 are herein incorporated by reference.

119  CMS allegedly removed Mr. Colodney for making statements that violated agency policies concerning the work environment. Mr. Colodney was not informed of those statements until October 2005, and even then, the agency sought to evade disclosing its alleged reasons for removal. Mr. Colodney was alleged to have made offensive comments.

120. CMS gave away for free the City Paper, an adult newspaper, at the entrance to the Agency. The Agency's lawyers admitted that this is an adult newspaper because of its blatant and grossly offensive material. CMS set a threshold for what is offensive and violative of its workplace policy with regard to offensive speech with its free distribution of this adult newspaper on agency property. CMS quashed Mr. Colodney's speech and allegedly removed him from the SES for his speech when the threshold the Agency itself set was much higher as established by its free distribution of an adult newspaper on Agency property. The Agency acted against Mr. Colodney solely because of his speech,

which was not violative of any Agency policy per the Agency's own standards as reflected in its distribution of the City Paper on Agency property.

121. As a result of defendant' violations of Mr. Colodney's freedom of speech, he has suffered and continues to suffer damage in the form of lost promotions and lost promotional opportunities, lost pay and other benefits associated with such promotions and otherwise, damage to his professional reputation and his career, as well as other expenses. In addition, he has suffered and continues to suffer emotional and mental distress and personal and professional humiliation, which has diminished his enjoyment of life and caused him additional pain and suffering.

### Count V – Violation of the 5th Amendment Equal Protection Clause of the US Constitution

122. Paragraphs 1 through 109 are herein incorporated by reference.

123. CMS allegedly removed Mr. Colodney for making statements that violated agency policies concerning the work environment. Mr. Colodney was not informed of those statements until October 2005, and even then, the agency sought to evade disclosing its alleged reasons for removal. Mr. Colodney was alleged to have made offensive comments.

124. CMS gave away for free the City Paper, an adult newspaper, at the entrance to the Agency. The Agency's lawyers admitted that this is an adult newspaper because of its blatant and grossly offensive material. CMS set a threshold for what is offensive and violative of its workplace policies with regard to offensive speech with its free distribution of this adult newspaper on agency property. CMS lacked any basis whatsoever for failing to equally enforce its policies in that it used an entirely undefined and secretive threshold to define Mr. Colodney's alleged comments as offensive when it

did not define the City Paper as offensive and condoned its free distribution in the open

on agency property. Mr. Colodney is in a class of one.

125. As a result of defendant' violations of equal protection, Mr. Colodney has suffered

and continues to suffer damage in the form of lost promotions and lost promotional

opportunities, lost pay and other benefits associated with such promotions and otherwise,

damage to his professional reputation and his career, as well as other expenses. In

addition, he has suffered and continues to suffer emotional and mental distress and

personal and professional humiliation, which has diminished his enjoyment of life and

caused him additional pain and suffering.

### Count VI – Denial of Constitutional Due Process

126. Paragraphs 1 through 109 are herein incorporated by reference.

127. Mr. Colodney was a career federal employee as a GS-15 prior to his appointment in

the SES at CMS. CMS removed Mr. Colodney from the SES after only approximately 9

weeks on the job, but he was not informed of the true details of the reason for his removal

until October 2005. Mr. Colodney's records reflect that he was removed for

unacceptable performance after only 9 weeks in the SES. Removal after only 9 weeks on

the job, alleging that he failed to lead and alleged horrendous conduct on his part, in a

career that depends on proven leadership, was a stigmatizing action that required

affording Mr. Colodney full due process rights, including but not limited to an impartial

decision maker, as well as an opportunity to know the detailed reasons for removal and

an opportunity to respond prior to removal. CMS failed to provide Mr. Colodney any

due process rights.

128. As a result of defendant' violations of Mr. Colodney's due process rights, he has suffered and continues to suffer damage in the form of lost promotions and lost promotional opportunities, lost pay and other benefits associated with such promotions and otherwise, damage to his professional reputation and his career, as well as other expenses. In addition, he has suffered and continues to suffer emotional and mental distress and personal and professional humiliation, which has diminished his enjoyment of life and caused him additional pain and suffering.

### Count VII – Violation of the 5th Amendment Equal Protection Clause of the US Constitution

129. Paragraphs 1 through 109 are herein incorporated by reference.

130. CMS alleged that it conducted an administrative investigation of Mr. Colodney pursuant to its policies on EEO and Offensive comments dated on or about September 2004. The said policies state that the investigations were to be thorough and impartial.

131. The Agency's action included, but are not limited to: Mr. Dyer pre-determined the outcome of the investigation at the very beginning; the Agency's lawyers and the investigation panel conducted an investigation with the intent of ensuring that the outcome was that Mr. Colodney be removed; that the Agency violated every material term of the SOP on Administrative Investigations; that the Agency manipulated investigation interviews and summaries; that the Agency executed a removal without any findings of fact from the investigation; that the decision maker failed to read a single document from the investigation; that the recommending official made her recommendation based on the repetition of hearsay put in the words of one of the investigators.

132. The Agency refused to apply the terms of Agency policy to Mr. Colodney as the object of an investigation, although the language of the policy specifically indicates that the investigation was to be thorough and impartial for his protection. The investigation was neither thorough, nor impartial. Mr. Colodney is in a class of one.

**Prayer for Relief**

Plaintiff prays that the Court render judgment in his favor and against defendant and enter an order:

Count I:

(a) declaring that the removal of plaintiff from his SES position as the Director, Office of HIPAA Standards, and making him a GS-15 was unlawful discrimination based upon his sex;

(b) awarding plaintiff compensatory damages against defendant in the amount of $ 300,000.00 (plus interest thereon);

(c) enjoining defendant from any future acts of discrimination against plaintiff;

(d) crediting plaintiff with having held the position from which he was removed to the date of the court's order, and requiring defendant to provide plaintiff with full back pay based on his having earned all monetary awards and salary bonuses and increases to which he would have been entitled had he never been removed from his position as Director, Office of HIPAA Standards on December 25, 2004, and had he received overall performance ratings of "Exceeds Expectations" (or "Outstanding", whichever is considered the top rating given by the Agency to members of the SRS) in that position from October 17, 2004 through the date of entry of judgment and of the order for full equitable relief;

(e) awarding plaintiff front pay from the date of the court's order forward

(f) requiring defendant to correct all its records, including plaintiff's official personnel folder ("OPF"), to reflect the above-mentioned relief (including performance ratings of "Outstanding" from October 2004 and thereafter;

(g) awarding the costs of bringing and maintaining this civil action and the administrative charges that preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 2000e-5(k); and

(h) awarding such other and further relief as the interests of justice may require.

Count II:

(a) declaring that the removal of plaintiff from his SES position as the Director, Office of HIPAA Standards, and making him a GS-15 was unlawful discrimination based upon his sex;

(b) awarding plaintiff compensatory damages against defendant in the amount of $ 300,000.00 (plus interest thereon);

(c) enjoining defendant from any future acts of discrimination against plaintiff;

(d)  crediting plaintiff with having held the position from which he was removed to the date of the court's order, and requiring defendant to provide plaintiff with full back pay based on his having earned all monetary awards and salary bonuses and increases to which he would have been entitled had he never been removed from his position as Director, Office of HIPAA Standards on December 25, 2004, and had he received overall performance ratings of "Exceeds Expectations" (or "Outstanding", whichever is considered the top rating given by the Agency to members of the SRS) in that position from October 17, 2004 through the date of entry of judgment and of the order for full equitable relief;

(e) awarding plaintiff front pay from the date of the court's order forward

(f) requiring defendant to correct all its records, including plaintiff's official personnel folder ("OPF"), to reflect the above-mentioned relief (including performance ratings of "Outstanding" from October 2004 and thereafter;

(g) awarding the costs of bringing and maintaining this civil action and the administrative charges that preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 2000e-5(k); and

(h) awarding such other and further relief as the interests of justice may require.


Count III:

(a) declaring that the removal of plaintiff from his SES position as the Director, Office of HIPAA Standards, and making him a GS-15 was unlawful retaliation for engaging in protected activity;

(b) awarding plaintiff compensatory damages against defendant in the amount of $ 300,000.00 (plus interest thereon);

(c) enjoining defendant from any future acts of retaliation;

(d) crediting plaintiff with having held the position from which he was removed to the date of the court's order, and requiring defendant to provide plaintiff with full back pay based on his having earned all monetary awards and salary bonuses and increases to which he would have been entitled had he never been removed from his position as Director, Office of HIPAA Standards on December 25, 2004, and had he received overall performance ratings of "Exceeds Expectations" (or "Outstanding", whichever is considered the top rating given by the Agency to

members of the SRS) in that position from October 17, 2004 through the date of entry of

judgment and of the order for full equitable relief;

(e) awarding plaintiff front pay from the date of the court's order forward

(f) requiring defendant to correct all its records, including plaintiff's official personnel folder

("OPF"), to reflect the above-mentioned relief (including performance ratings of "Outstanding"

from October 2004 and thereafter;

(g) awarding the costs of bringing and maintaining this civil action and the administrative

charges that preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 2000e-

5(k); and

(h) awarding such other and further relief as the interests of justice may require.

Count IV:

(a) declaring that the defendant did unlawfully deny Mr. Colodney his freedom of

speech, and that it purports to have removed Mr. Colodney from his SES position based

on the denial of his freedom of speech;

(b) awarding plaintiff compensatory damages against defendant in the amount of $

10,000,000.00 (plus interest thereon);

(c) enjoining defendant from any future acts of denying Mr. Colodney his freedom of speech;

(d) crediting plaintiff with having held the position from which he was removed to the date

of the court's order, and requiring defendant to provide plaintiff with full back pay based on his

having earned all monetary awards and salary bonuses and increases to which he would have

been entitled had he never been removed from his position as Director, Office of HIPAA

Standards on December 25, 2004, and had he received overall performance ratings of "Exceeds

Expectations" (or "Outstanding", whichever is considered the top rating given by the Agency to members of the SRS) in that position from October 17, 2004 through the date of entry of judgment and of the order for full equitable relief;

(e) awarding plaintiff front pay from the date of the court's order forward

(f) requiring defendant to correct all its records, including plaintiff's official personnel folder ("OPF"), to reflect the above-mentioned relief (including performance ratings of "Outstanding" from October 2004 and thereafter;

(g) awarding the costs of bringing and maintaining this civil action and the administrative charges that preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 2000e-5(k); and

(h) awarding such other and further relief as the interests of justice may require.

Count V:

(a) declaring that the defendant did unlawfully deny Mr. Colodney his right to equal protection under the U.S. Constitution, and that his subsequent removal from the SES results from this denial of equal protection;

(b) awarding plaintiff compensatory damages against defendant in the amount of $ 10,000,000.00 (plus interest thereon);

(c) enjoining defendant from any future acts of denying Mr. Colodney his right to equal protection under the U.S. Constitution;

(d) crediting plaintiff with having held the position from which he was removed to the date of the court's order, and requiring defendant to provide plaintiff with full back pay based on his having earned all monetary awards and salary bonuses and increases to which he would have

been entitled had he never been removed from his position as Director, Office of HIPAA

Standards on December 25, 2004, and had he received overall performance ratings of "Exceeds

Expectations" (or "Outstanding", whichever is considered the top rating given by the Agency to

members of the SRS) in that position from October 17, 2004 through the date of entry of

judgment and of the order for full equitable relief;

(e) awarding plaintiff front pay from the date of the court's order forward

(f) requiring defendant to correct all its records, including plaintiff's official personnel folder

("OPF"), to reflect the above-mentioned relief (including performance ratings of "Outstanding"

from October 2004 and thereafter;

(g) awarding the costs of bringing and maintaining this civil action and the administrative

charges that preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 2000e-

5(k); and

(h) awarding such other and further relief as the interests of justice may require.

Count VI:

(a) declaring that the defendant did unlawfully deny Mr. Colodney his Constitutional

due process rights, and that his subsequent removal from the SES resulted therefrom;

(b) awarding plaintiff compensatory damages against defendant in the amount of $

10,000,000.00 (plus interest thereon);

(c) enjoining defendant from any future acts of denying Mr. Colodney due process;

(d) crediting plaintiff with having held the position from which he was removed to the date

of the court's order, and requiring defendant to provide plaintiff with full back pay based on his

having earned all monetary awards and salary bonuses and increases to which he would have

been entitled had he never been removed from his position as Director, Office of HIPAA

Standards on December 25, 2004, and had he received overall performance ratings of "Exceeds

Expectations" (or "Outstanding", whichever is considered the top rating given by the Agency to

members of the SRS) in that position from October 17, 2004 through the date of entry of

judgment and of the order for full equitable relief;

(e)  awarding plaintiff front pay from the date of the court's order forward

(f) requiring defendant to correct all its records, including plaintiff's official personnel folder

("OPF"), to reflect the above-mentioned relief (including performance ratings of "Outstanding"

from October 2004 and thereafter;

(g) awarding the costs of bringing and maintaining this civil action and the administrative

charges that preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 2000e-

5(k); and

(h) awarding such other and further relief as the interests of justice may require.

Count VII:

(a) declaring that the defendant did unlawfully deny Mr. Colodney his right to equal

protection under the U.S. Constitution, and that his subsequent removal from the SES

results from this denial of equal protection;

(b) awarding plaintiff compensatory damages against defendant in the amount of $

10,000,000.00 (plus interest thereon);

(c) enjoining defendant from any future acts of denying Mr. Colodney his right to equal

protection under the U.S. Constitution;

(d) crediting plaintiff with having held the position from which he was removed to the date of the court's order, and requiring defendant to provide plaintiff with full back pay based on his having earned all monetary awards and salary bonuses and increases to which he would have been entitled had he never been removed from his position as Director, Office of HIPAA Standards on December 25, 2004, and had he received overall performance ratings of "Exceeds Expectations" (or "Outstanding", whichever is considered the top rating given by the Agency to members of the SRS) in that position from October 17, 2004 through the date of entry of judgment and of the order for full equitable relief;

(e) awarding plaintiff front pay from the date of the court's order forward

(f) requiring defendant to correct all its records, including plaintiff's official personnel folder ("OPF"), to reflect the above-mentioned relief (including performance ratings of "Outstanding" from October 2004 and thereafter;

(g) awarding the costs of bringing and maintaining this civil action and the administrative charges that preceded it, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 2000e-5(k); and

(h) awarding such other and further relief as the interests of justice may require.

**Jury Demand**

Plaintiff hereby requests a jury trial on all issues of fact and damages triable by jury.

Respectfully submitted,

Nathan J. Colodney
c/o Deputy Chief of Staff Office
PSC 303, Box 45
APO AP 96204

June 16, 2008

*H 1089 1069 RMC* (handwritten)

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I. (a) PLAINTIFFS

*Nathan J. Clooney* (handwritten)

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  *99999* (handwritten)
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
*% Deputy Chief of Staff PSC 303 Box 45 APO AP 96204* (handwritten)

## DEFENDANTS

*Michael O. Leavitt* (handwritten)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE ...

Case: 1:08-cv-01069
Assigned To : Collyer, Rosemary M.
Assign. Date : 6/20/2008
Description: Employ. Discrim.

*JURY ACTION* (stamp)

## II. BASIS OF JURISDICTION
(PLACE an x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

● 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE an x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

☐ **A. Antitrust**

☐ 410 Antitrust

☐ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☐ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

*(3)* (handwritten, circled)

| □ G. *Habeas Corpus/ 2255*<br><br>□ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | ⊙□ H. *Employment Discrimination*<br><br>⊙□ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ I. *FOIA/PRIVACY ACT*<br><br>□ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ J. *Student Loan*<br><br>□ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| □ K. *Labor/ERISA (non-employment)*<br><br>□ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ L. *Other Civil Rights (non-employment)*<br><br>□ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ M. *Contract*<br><br>□ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ N. *Three-Judge Court*<br><br>□ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  □ 2 Removed from State Court  □ 3 Remanded from Appellate Court  □ 4 Reinstated or Reopened  □ 5 Transferred from another district (specify)  □ Multi district Litigation  □ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*42 USC 2000*

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23 | **DEMAND $** | Check YES only if demanded in complaint<br>**JURY DEMAND:** ⊙ YES    □ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**  N.O.    (See instruction)  □ YES  ⊙ NO    If yes, please complete related case form.

DATE *6.20.08*    SIGNATURE OF ATTORNEY OF RECORD  *NCD*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.